### In re GUARDIANSHIP OF Sharon KOWALSKI, Ward.

#### No. C1-85-1595.

Court of Appeals of Minnesota.

March 4, 1986.
Certiorari Denied March 24, 1986.
See 106 S.Ct. 1467.
Review Denied April 18, 1986.

Jack Fena, Hibbing, Harry A. Sieben, Jr., Grose, Von Holtum, Sieben & Schmidt, Ltd., Minneapolis, for respondent Donald Kowalski.

M. Sue Wilson, Jane Binder, Stephanie Susens, Wilson & Pomerene, Minneapolis, for Karen Thompson.

Gary L. Pringle, Thomas D. Hayes, Smith, Pringle & Hayes, Monticello, for appellant Sharon Kowalski, Ward.

Brian B. O'Neill, Amy B. Bromberg, Faegre & Benson, Minneapolis, Volunteer Attys. for amicus Curiae Minnesota Civil Liberties Union.

Heard, considered and decided by POPOVICH, C.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

POPOVICH, Chief Judge.

This appeal is from an order confirming the appointment of a guardian and vesting him with full statutory powers, including the power to determine visitation. Appeal is made by the ward through her court-appointed counsel. Karen Thompson who originally filed for appointment as the ward's guardian also asserts her position in this matter. Appellant and Thompson claim the trial court (1) abused its discretion in naming the ward's father as guardian, (2) erred in vesting the guardian with the power to determine visitation because such power is overly restrictive of the ward's rights of association and her preference regarding visitors, and (3) erred in establishing a guardianship rather than a conservatorship. We affirm.

## FACTS

On November 13, 1983, 27-year-old Sharon Kowalski was involved in a violent auto-

mobile accident which left her physically and mentally impaired. She is confined to a wheelchair. Her communication skills are limited to hand and face signals, pointing to written words, one-finger typing on an electric typewriter, and physical displays of emotion. She often gives inconsistent responses. She is burdened with a child's mental capacity between four and six years of age.

Given Sharon Kowalski's condition, on March 2, 1984 Karen Thompson petitioned for appointment as her friend's guardian. Donald Kowalski, Sharon's father, cross-petitioned for appointment. On April 25, 1984, the probate court concluded Sharon Kowalski was an incapacitated person and ordered Donald Kowalski appointed as guardian of the ward. The probate court found:

> The Court recognizes that Karen Thompson and Donald and Della Kowalski each have a significant relationship with the Ward, Sharon Kowalski, and finds each to be a suitable and qualified person to discharge the trust. However, in light of the difficulties existing between them the Court is unwilling to appoint joint guardians. Therefore, the Petitioner, Karen Thompson, agrees to the appointment of Donald Kowalski as guardian with no recognition that he is the most suitable and best qualified among those available and willing to discharge the trust, but is willing to accept the Court's appointment of Donald Kowalski under certain conditions and restrictions in order to avoid a contested hearing in the matter, which might not be in Sharon's best interest and in order to make every effort to resolve the difficulties existing between them.

The Donald Kowalskis and Karen Thompson were given equal access to Sharon's medical and financial records and equal right to consult with medical and financial personnel. Both parties were given equal visitation rights. Karen Thompson was designated as an additional person to whom notice of proceedings must be given.

The relationship between Sharon Kowalski and Karen Thompson is uncertain. They had been roommates for four years prior to the accident, had exchanged rings, and had named each other as beneficiary in their life insurance policies. Prior to the accident, Sharon had closed their joint bank account and had also told her sister she was considering moving to Colorado or moving home and that Karen Thompson was becoming very possessive. Karen Thompson claims a lesbian relationship with Sharon Kowalski. Sharon never told her family of such a relationship or admitted it prior to the accident.

Sharon Kowalski was originally placed in St. Cloud Hospital, but was subsequently transferred to other institutions. On June 29, 1984, the probate court ordered her moved to the Country Manor Nursing Home in Sartell. On September 14, 1984, she was ordered transferred to the Nat G. Polinsky Memorial Rehabilitation Center in Duluth. On October 31, 1984, the probate court ordered her transferred to Park Point Manor Nursing Home in Duluth.

The difficult relationship between Karen Thompson and the Donald Kowalskis continued to deteriorate through a series of motions. On November 1, 1984, a temporary restraining order was issued against Karen Thompson prohibiting her from disseminating to the media contents of the ward's medical records, from bringing anyone with her to visit the ward, and from engaging in disruptive behavior at the nursing home. A restraining order was issued on November 19, 1984 prohibiting both Thompson and Donald Kowalski from examining medical records at the nursing home, from bringing others with them to Park Point Manor, and from engaging in disruptive conduct at the nursing home. On October 31, 1984, Donald Kowalski moved to amend the original guardianship order. On November 28, 1984, Thompson moved for Donald Kowalski's removal as guardian. Both motions were dismissed on December 12, 1984.

Various motions were heard on May 3 and May 9, 1985. Donald Kowalski moved

for termination of Thompson's visitation and contact with the ward. Thompson again moved to remove Donald Kowalski as guardian. By order filed July 23, 1985, the district court found:

> The ongoing conflict between Don and Della Kowalski and Karen Thompson adversely affects the welfare of Sharon Kowalski at the present time; and elimination of that conflict and its adverse affect on the ward is in the best interest of the ward at the present time.

Medical evidence was presented supporting termination of Karen Thompson's visitation. Dr. George Cowan, a psychiatrist of numerous qualifications, recommended Thompson be prohibited from visiting the ward because the ward enters a detrimental, depressed state after Thompson's visits. Nurses at Park Point Manor also observed the depressive condition. Dr. Steven K. Goff, M.D., of the Polinsky Rehabilitation Center concurred with Dr. Cowan's recommendation as did Dr. Julie C. Moller, the ward's attending physician in Duluth.

The trial court therefore ordered the appointment of Donald Kowalski confirmed and continued without limitation or condition. Thompson's equal access to medical and financial information and personnel was terminated. Donald Kowalski was vested with the power to determine the ward's visitors, but the trial court ordered:

> The guardian shall consider, regarding all visitation decisions, that the primary consideration is the best interest of the ward and any reliably expressed wishes of the ward, both of which may change from time to time. The guardian shall also consider regarding visitation, the recommendations of medical and health care personnel and the needs and desires of the institution wherein the ward resides.

Donald Kowalski immediately terminated Thompson's visitation.

Four appeals were taken from the July 23 order. On August 8, 1985, notice of appeal was filed by the Minnesota Civil Liberties Union (MCLU) on behalf of Sharon Kowalski (C1-85-1502). On August 22, 1985, notice of appeal was filed by the Minnesota Civil Liberties Union in conjunction with Sharon Kowalski's court-appointed counsel (C1-85-1595), and a petition for discretionary review was filed by Karen Thompson (C2-85-1590). On September 3, 1985, notice of appeal from the July 23 order was filed by Karen Thompson (C5-85-1664), but was subsequently dismissed on Thompson's motion on December 2, 1985. By order of this court on September 19, 1985, appeal C1-85-1502 was dismissed and petition for discrietionary review C2-85-1590 was denied. Appeal C1-85-1595 was ordered treated as an appeal by the ward through her court-appointed counsel. The MCLU was permitted to file an amicus brief and Karen Thompson was permitted to assert her position in this appeal. The court of appeals' order also gave effect to the July 23 trial court order pending resolution of this appeal. A petition for further review of the July 23 order, writ of prohibition, and writ of mandamus was denied by the Minnesota Supreme Court on November 4, 1985.

## ISSUES

1. Did the trial court abuse its discretion by confirming Donald Kowalski's appointment as guardian?

2. Did the trial court err in vesting the guardian with power to determine visitation of the ward?

3. Did the trial court err in establishing a guardianship?

## ANALYSIS

1. Karen Thompson claims the trial court abused its discretion in vesting Donald Kowalski with the full statutory powers of guardianship. She regards herself as the ward's proper guardian given the ward's preference and their alleged relationship.

> The Minnesota Supreme Court has long held that the appointment of a guardian is a matter peculiarly for and within the discretion of the appointing court. *In Re*

*Guardianship of Dahmen*, 192 Minn. 407, 256 N.W. 891 (1934).

* * * The court will not interfere with the exercise of this discretion except in the case of a clear abuse.

*Schmidt v. Hebeisen*, 347 N.W.2d 62, 64 (Minn.Ct.App.1984).

Minnesota Statutes requires:

[T]he court shall make a finding that the person to be appointed as guardian or conservator is the most suitable and best qualified person among those who have indicated to the court that they are available and willing to discharge the trust before making the appointment.

Minn.Stat. § 525.551, subd. 5 (1984).

Donald Kowalski argues his confirmation as guardian is proper because he is the ward's father and therefore has unconditional parental love for his daughter.

Courts generally select someone with family ties or the nominees of such persons when appointing a guardian. However, that requirement is not mandatory and the court will disregard the application of a family member if their interest and those of the ward would conflict. "The best interest of the ward should be the decisive factor in making any choice on his behalf." *In Re Guardianship of Schober*, 303 Minn. 226, 230, 226 N.W.2d 895, 898 (1975).

*Schmidt*, 347 N.W.2d at 64; *see* Minn.Stat. § 525.544 (1984) (any qualified person may be appointed by the court as guardian).

Thompson claims the ward clearly prefers her as guardian based on the ward's choice of her as a partner. Preference of the ward is an important factor. *See* Minn. Stat. § 525.544 (if the ward has "sufficient capacity to form an intelligent preference" she may nominate a guardian). Thompson cites for support *In re Guardianship of Dahmen*, 192 Minn. 407, 256 N.W. 891 (1934). There, an elderly woman stated she wanted her daughter to be her guardian. The supreme court honored her preference. While the woman had suffered a stroke and could communicate only by responding "yes" or "no" to questions, there

was no indication she was considered to lack capacity to make a choice.

Here, the testimony indicates the ward is unable to give consistent responses. She is brain injured. The trial court found:

The ward's ability to respond or communicate had been inconsistent and, at times, unreliable, which situation may or may not improve.

Thompson claims the confidential relationship between herself and the ward warrants her appointment as guardian. She argues a guardianship is a fiduciary relationship and no one could more adequately fill that relationship than a claimed "spouse." Thompson cites the prohibition against spousal testimony. *See* Minn.Stat. § 595.02, subd. 1(a) (Minor child and her parent also are subject to the same restriction. *See id.* subd. 1(i).) Thompson fails to acknowledge the strong confidential relationship which exists between parent and child. That relationship is presumably even stronger when the child has been incapacitated to a four- to six-year-old mental ability.

■ The evidence does not indicate the trial·court abused its discretion in confirming the appointment of Donald Kowalski as guardian. The trial court found, "Donald Kowalski is the most suitable and best qualified among those available and willing to discharge the trust." The record supports the court's finding. Any preference of the ward regarding guardianship is unreliable. The best interests of the ward are served by Kowalski's appointment. Regardless of the relationship between the ward and Thompson, Thompson's contact with the ward upsets the ward and results in her depression. In choosing another as guardian, the trial court served the ward's best interest and acted within its discretion.

2. The ward through her court-appointed counsel, Karen Thompson, and the Minnesota Civil Liberties Union (MCLU) as amicus curiae, all claim the trial court erred in vesting the guardian with the full power of guardianship. They argue in various ways the guardian's power should have been limited to that of a conservator-

ship. *See* Minn.Stat. § 525.539, subds. 2, 3 (1984). Their argument's crux is the ward should be free to determine who may visit her, rather than the guardian as ordered by the trial court. They claim the trial court order was not least restrictive of the ward's rights, the ward's preference was not considered, and the trial court's findings were inadequate.

a) *Least Restrictive Alternative.*

■ The essential issue is whether the ward's fullest autonomy is preserved in light of her medical needs. The court may grant to a guardian:

> The duty and power to exercise supervisory authority over the ward or conservatee in a manner which limits his civil rights and restricts his personal freedom only to the extent necessary to provide needed care and services.

Minn.Stat. § 525.56, subd. 3(6). Here, the ward's personal freedom to determine her own visitors has been limited. That limitation must be shown to be necessary.

> The court shall grant to a guardian or conservator only those powers necessary to provide for the demonstrated needs of the ward or conservatee.

*Id.* subd. 2.

Sharon's counsel claims the ward has privacy interests protecting her freedom of association.[1] The Minnesota Supreme Court has addressed the privacy rights of those under guardianship.

> At the core of the privacy decisions, in our judgment, is the concept of personal autonomy—the notion that the Constitution reserves to the individual, free of governmental intrusion, certain fundamental decisions about how he or she will conduct his or her life. Like other constitutional rights, however, this right is not an absolute one and must give way to certain interests of the state, the balance turning on the impact of the decision on the life of the individual. As the impact increases, so must the importance

of the state's interest. Some decisions, we assume, will be of little consequence to the individual and a showing of a legitimate state interest will justify its intrusion; other decisions, on the other hand, will be of such major consequence that only the most compelling state interest will justify the intrusion.

*Price v. Sheppard,* 307 Minn. 250, 257, 239 N.W.2d 905, 910 (1976) (footnote omitted). The compelling state interest present here is protection of the ward's well being by the State acting as *parens patriae. See id.* at 258–59, 239 N.W.2d at 911.

> "Under the *parens patriae* rationale, an individual may be committed when he lacks capacity to make a rational decision concerning hospitalization, and the treatment or custodial care available would be beneficial enough to outweigh the deprivations which commitment would impose on him. Inherent in an adjudication that an individual should be committed under the state's *parens patriae* power is the decision that he can be forced to accept the treatments found to be in his best interest; it would be incongruous if an individual who lacks capacity to make a treatment decision could frustrate the very justification for the state's action by refusing such treatments." Note, *Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1190, 1344 (1974).

*Id.* at 259, 239 N.W.2d at 911. Quietude is essential to a patient's recovery or improvement and in the patient's best interest. The record indicates certain visitation has an unsettling effect on the ward. A pattern has developed indicating Thompson's visits may produce significant responses from the ward, but the ward regularly experiences depression and moodiness following Thompson's visits. Medical testimony supported termination of Thompson's visitation as in the ward's best interest. Given this evidence, regulation of visitation

---

**1.** By enacting the patients' bill of rights, the Minnesota Legislature sought to protect the individual liberties of those under medical care.

*See* Minn.Stat. § 144.651. That statute imposes duties upon health care facilities, however, not upon guardians. *See id.* § 144.652, subd. 2.

is necessary to provide for the ward's needs and least restrictive of her rights.

b) *Ward's Preference.*

As stated in the trial court's order, the ward's preference regarding visitation is important. The trial court in removing the ward's autonomy instructed the guardian

> that the primary consideration is the best interest of the ward and any reliably expressed wishes of the ward, both of which may change from time to time.

At present, the ward's responses to questions are inconsistent. She has expressed interest in visiting with Thompson. Thompson claims the ward has clearly indicated to her the ward's preference to maintain their visitation. The guardian claims he is acting consistent with the ward's preference to move away from Thompson based on Thompson and the ward's relationship just prior to the accident.

While the ward is able to communicate, the reliability of her responses is uncertain. Even if the ward could indicate her preference, the guardian is bound by the trial court order to balance her wishes with her best interest. These factors may not be in agreement. Evidence of whether the guardian has abused his authority as ordered by the trial court to properly consider both the ward's best interest and her desires may be brought to the trial court's attention as the guardianship progresses.

The trial court directed the guardian to consider both of these important factors: the ward's best interest and the ward's desires. The guardian is vested with the power to balance these interests for the ward.

c) *Specific Findings.*

The two key issues here involve the ward's competency to communicate and her best interests. With specific respect to these factors, the trial court found:

> The ward's ability to respond or communicate had been inconsistent and, at times, unreliable, which situation may or may not improve.

> \*    \*    \*    \*    \*    \*

The ongoing conflict between Don and Della Kowalski and Karen Thompson adversely affects the welfare of Sharon Kowalski at the present time; and elimination of that conflict and its adverse affect on the ward is in the best interest of the ward at the present time.

These findings support the trial court's order vesting the guardian with the power to determine visitation.

█ 3. Appellant and Thompson also claim guardianship is not warranted, but assert the ward should be properly placed under conservatorship. A guardian is vested with all powers and duties for care of an incapacitated person. Minn.Stat. § 525.-539, subd. 2 (1984). A conservator may exercise only some powers and perform some duties for care of the incapacitated. *Id.* subd. 3.

The trial court found:

The ward is incapable of exercising the following rights and powers:

a. To establish her place of abode.

b. To determine her food, clothing, shelter, health care, social and recreational requirements, and training, educational and rehabilitation requirements.

c. To dispose of her clothing, personal effects, vehicles, furniture or other property.

d. To consent to necessary medical or other professional care, counseling, treatment or service.

e. To approve or withhold approval of any contract, except for necessities which the ward may make or wish to make.

f. To pay reasonable charges for the support, maintenance and education of the ward.

g. To pay any debts of the ward.

h. To possess and manage her estate, collect all debts and claims in her favor or compromise them, to invest all funds not needed for current debts and charges, and to represent herself in court proceedings or institute suit.

i. To vote.

These rights and powers parallel those awarded to a guardian for care of the ward. *See* Minn.Stat. § 525.56, subd. 3.

The court may appoint a guardian of the person if it determines that all the powers and duties listed in this subdivision are needed to provide for the needs of the incapacitated person. The court may appoint a conservator of the person if it determines that a conservator is needed to provide for the needs of the incapacitated person through the exercise of some, but not all, of the powers and duties listed in this subdivision.

*Id.* The trial court found *all* applicable powers and duties of subdivision 3 should be vested in Donald Kowalski based on its findings regarding Sharon's inability to exercise those rights and powers. The record supports the trial court's findings. We conclude the trial court did not err in creating a guardianship rather than a conservatorship.

### DECISION

The trial court did not abuse its discretion by confirming the ward's father as guardian. The trial court did not err by vesting the guardian with power to determine visitation of the ward, nor in creating a guardianship rather than a conservatorship.

Affirmed.